STATE OF NORTH CAROLINA v. DAVID BERNARD FOSTER

No. 38

(Filed 15 December 1977)

1. Criminal Law § 124.5— two defendants—verdicts of guilty and not guilty—no requirement of consistency

The trial court did not err in refusing to direct a verdict of not guilty as to defendant Foster after the jury had acquitted another defendant, even though the State's case against both defendants depended upon the testimony of an accomplice who implicated them both in the attempted robbery, since the jury could believe the accomplice's testimony with respect to one defendant's participation in the crime, and disbelieve the accomplice's testimony with respect to the other defendant's complicity.

2. Criminal Law § 73.2— statement made in defendant's presence—no hearsay

In a prosecution for first degree murder committed during an attempted armed robbery at which defendant was present, the judge did not err in allowing one participant to testify that another, in his presence and defendant's, suggested the robbery, such testimony being competent to show defendant's knowledge that his companions planned to rob a supermarket when the group entered it; moreover, the witness thereafter gave substantially identical testimony without objection.

3. Homicide § 20— murderer's scars—showing to jury proper

In a prosecution for first degree murder committed during an attempted armed robbery, the trial court did not err in permitting the jury to view the scars from the wounds which, an accomplice testified, the victim had inflicted upon him with a butcher knife at the time he shot the victim, since the scars were illustrative of relevant and material testimony.

4. **Criminal Law § 89.10— prior criminal conduct—cross-examination—reference to arrest record**

   The trial court did not err in allowing the district attorney to question two witnesses concerning their criminal convictions and specific acts of misconduct while the district attorney was referring to arrest records.

5. **Criminal Law § 134.4— death or life imprisonment mandatory—youthful offender statutes inapplicable**

   Since neither N.C. Gen. Stats. Ch. 148, Art. 3A, §§ 148-49.1 through 148-49.9 (repealed) nor N.C. Gen. Stats., Ch. 148, Art. 3B, §§ 148-49.10 through 148-49.16 providing for Programs for Youthful Offenders was intended to apply to a youthful offender who commits a crime for which death or a life sentence is the mandatory punishment, the trial court in a felony murder prosecution properly imposed upon defendant the mandatory sentence of life imprisonment.

6. **Homicide § 25.1— felony murder—term improper in issue**

   Use of the term "felony murder" in an issue submitted to the jury is ill-advised, and the Supreme Court expressly disapproves its usage.

7. **Homicide § 31— guilty of felony murder—verdict interpreted as guilty of first degree murder**

   Where the evidence, which the jury found to be true, established defendant's guilt of murder in the first degree, and the trial court properly instructed the jury that "any killing of a human being by a person committing or attempting to commit armed robbery is first degree murder without anything further being shown," ambiguity in the verdict of "guilty of felony murder" is interpreted as a verdict of guilty of murder in the first degree.

APPEAL by defendant under G.S. 7A-27(a) from *Friday, J.*, at the January 1977 Session of the Superior Court of MECKLENBURG.

Upon a bill of indictment drawn under G.S. 15-144, defendant was tried and convicted of the first-degree murder of James A. Small. Defendant Foster's trial was consolidated with that of Annette Lindsay Boulware, who had been indicted for the same offense. The State's evidence tended to establish the following facts:

James A. Small, aged 43, owned and operated Jimmy's Market, a grocery located on Old Statesville Road (Highway No. 21) in Mecklenburg County. Between 8:30 and 9:00 p.m. on 17 August 1976 James Luckey, a customer, was approaching the entrance of Jimmy's Market. There he was stopped by a young black man with a gun who said, "It's a robbery." When Luckey "froze" the man with the gun entered the store. About five minutes later Luckey heard three or four shots. Then three black

men ran from the store. They entered a dark, four-door Chevrolet parked beside the building. A fourth black person, at the wheel of this car, immediately drove it away. Luckey was unable to identify any of the men who fled the store.

Inside the store, Rommie Ross, an employee tending the cash register at the front of the store, had seen the three black males enter and go down different aisles to the rear. Ross continued checking out customers until he heard two shots fired at the rear of the store. One of the men then appeared at his cash register with a .38 caliber pistol and ordered Ross to put up his hands. Almost immediately Ross heard two more shots at the back and saw a black male run out the front door. Another, bleeding badly, followed as the one covering Ross backed out of the store. Mr. Small called from the rear of the store that he had been shot. Ross found him standing by the butcher block; his shirt was bloody and he looked as if he had "a couple of puncture wounds." Of the three men who entered the store, Ross was able to identify only the State's witness, Kenneth Martin, the man who had left the store bleeding.

Loretta Mitchell, a customer in the store at the time Small was shot, identified Kenneth Martin as the black male she saw behind the meat counter holding a gun on Small. Upon observing Martin she moved to the front of the store where she saw another black male with a gun. He was not defendant Foster. At that time she heard about five shots come from the meat counter at the rear of the store. The man at the front then pointed the gun at her and she backed into another aisle.

A commotion at the entrance to Jimmy's Market had attracted the attention of Mr. Eddie Burleson, who was sitting in his parked automobile. He saw a black man holding a gun leave the store and walk briskly to a dark, four-door Chevrolet in which two people were sitting. The man with the gun was joined by another person who emerged from the shadows and both jumped into the car, which sped away. Burleson followed the fleeing vehicle until it pulled off the road into an abandoned filling station. Before passing he saw two people leave the vehicle. He "avoided pulling into where they were," and he was unable to ascertain the license number of the automobile or to identify any of its occupants.

Kenneth Martin, heretofore identified as the black male who left the store bleeding profusely, was the primary witness for the State. His testimony, summarized below, tended to show:

On the evening of 17 August 1976 Martin, aged 16, defendant Foster, 17, and Boulware, 23, were attending "a little get-together" at the home of Joyce Pettus. About 8:30 the three left the Pettus house to go to a store two blocks away to buy some beer. Outside they were joined by Ernest Williams, aged 22, also known as "New York." The four got into the automobile which Boulware had driven to the party but which belonged to her mother. In the car Williams and Boulware began reminiscing about an armed robbery effected together. Williams suggested to the group that Jimmy's Supermarket was a store they could "rob for some money." Martin testified that Williams was carrying a .32 or .38 pistol; that defendant had a blue steel .22 pistol; and that he was armed with the .32 pistol which he "usually carried" with him albeit he was on parole for breaking and entering. They "decided to go to Jimmy's" and Boulware drove them to Small's Supermarket.

At the store Boulware parked the car at the side facing the street, and the three men went inside where they met in the restroom. There they agreed that Martin was to remain at the back and watch the butcher; Williams was to be at the door; and Foster, at the cash register. Pursuant to plan, Martin approached Small and, with gun in hand, directed him to enter the restroom. Small, after starting in that direction, suddenly attacked Martin with a butcher knife. In the ensuing scuffle Martin shot Small three times, once in his midsection and twice in the chest area. Martin, however, received stab wounds in his back and severe cuts on his arms and legs. While they were wrestling on the floor Martin felt Small go limp and he "took off running toward the front of the store." In front of him Martin saw Williams at the door with a gun in his hand. At the door Martin looked around and Foster was behind him also holding a gun. The three jumped into the back seat of Boulware's car and she drove off down the highway. Martin announced that he was bleeding badly and Boulware said, "We've got to get out of the car." Williams requested her to pull over and let him out. Martin said that he was not going to get out and instead requested that he be carried to the hospital. When the car stopped, however, defendant Foster

pushed Martin out into a trench. Foster and Williams then jumped from the car and ran in opposite directions. Boulware then drove away.

With some aid from a passing bicyclist Martin managed to reach his home where his sister summoned aid. The ambulance and police cars arrived simultaneously.

On 21 August 1976, after he had been fully advised of all his rights and had signed a written waiver of counsel, Martin made an oral statement to the police which he himself thereafter put in writing. Introduced into evidence as State's Exhibit No. 12 the written statement corroborated Martin's testimony at the trial in all material aspects. Additional adminicular evidence, not necessary to detail here, substantiated Martin's testimony.

On cross-examination Martin testified that in exchange for his testimony in this case the district attorney had agreed that Martin would be charged with second-degree murder instead of first-degree murder. Martin admitted that before he left the hospital he had written Foster that he himself would "take the rap" and "cut Foster loose." By that he meant Foster did not kill the man and that he wanted Foster to get out of jail and shoot "New York," whom he has not seen since that night. Martin also stated that he was still angry with Foster for pushing him out of the car and running into the woods; that he could never forget the treatment he received from his confederates and that their conduct was "partially" the reason he was testifying for the State against defendant and Boulware. He further admitted that in jail he also had told Boulware he was going "to cut her loose" but he had said it only to end their conversation.

Martin further testified, "Boulware was driving the car. She knew we were going to go into Jimmy's. She knew we were going to rob them. We all knew it. We sat out in the car and discussed it before we took off and while we were driving to the store. Ernest Williams suggested robbing the place." Martin "never saw Ernest Williams put a gun at Boulware's head" to force her to drive the car away from Jimmy's Supermarket. "The car was already running."

Expert medical testimony tended to show that Small was brought to the Charlotte Memorial Hospital on the evening of 17 August 1976. He had been shot three times. One bullet had

penetrated the colon, the pancreas, and the posterior wall of the stomach. Another bullet had entered his arm and the third, the left hip area. After undergoing two operations, Small died on 4 September 1976 from peritonitis and other complications resulting from these gunshot wounds.

Defendant Foster's testimony as a witness for himself tended to show:

About dark on 17 August 1976 Martin went to the basketball court where defendant Foster had been playing most of the day. Martin asked Foster if he would go with him "to get high some more." Earlier the two had spent thirty minutes together smoking marijuana. Foster followed Martin to a blue 1972 Chevrolet in which Boulware and Ernest Williams ("New York") were sitting. Defendant had never before seen Williams; he had seen Boulware but was not acquainted with her. Defendant was told that they were going to a store, Evans & Sons on Statesville Avenue, to get some kerosene for Boulware's mother. When they found Evans & Sons closed Williams requested Boulware to take him to Jimmy's Supermarket to get some canned goods and, upon his promise to buy her some gas, she agreed to do so. Once at Jimmy's Boulware did not get out of the car because Jimmy's did not sell kerosene. Defendant got out with Martin and Williams because he wanted to buy a can of Beenie Weenies. In the car defendant never heard any discussion about an armed robbery.

Inside the store, defendant was searching for the Beenie Weenies when he heard shots. He walked toward the door and saw Williams holding a gun on the cashier. Defendant left the store, returned to the car and said to Boulware, "Annette, they pulled a gun on these people, shooting and going on. Let's go." She turned the car around but traffic prevented her from entering the highway. This delay enabled Martin and Williams, who had run out of the store, to jump into the car, Martin in back with defendant and Williams in front with Boulware. Williams put a gun to her head and said, "Bitch, drive this car." He cocked the gun back and she drove off. Before going into Jimmy's defendant had seen no guns.

About ten blocks down the street Boulware stopped the car and ordered them to get out. Martin said he was cut badly and wasn't going to get out. Williams jumped out and fled across the

street, defendant pushed Martin out of the car and then walked up the street.

In jail defendant had an opportunity to talk with Martin and he asked him why he put him "in all this mess." Martin replied that he was going to get even with him for pushing him out of the car.

Codefendant Boulware also testified in her own behalf. In brief summary her testimony tended to show:

At 7:00 p.m. on 17 August 1976 she was at the home of her mother playing cards with her mother, sister, and two friends. (These persons later testified in corroboration of this testimony.) About 7:40 p.m. her mother gave her some money and the keys to her car for the purpose of going to the store to buy kerosene. En route to the G & M store to get the kerosene she saw Martin and Williams thumbing a ride. She had not previously seen them or Foster that day. She picked them up and, at Martin's request, she detoured by the basketball court so that he could speak to his friend Foster. In a few minutes Martin returned to the car with Foster, who said "he wanted to pick up some things at the store." Since she was going to Evans & Sons she agreed to take him.

From this point on Boulware's testimony dovetails with that of defendant Foster; there is no material variation. She testified that there was never any conversation about an armed robbery or "who had what pistol"; that she had never committed an armed robbery with Williams; and that she never saw a pistol until Williams came out of the store with one. Boulware also testified that on the first day of the term, while she was in a holding cell convenient to the courtroom, she had "called through the cells" to Martin and asked him why he had lied about her and got her into "this trouble when he knew she was not involved in any robbery." His reply was, "When I go to court, I'm going to tell them you didn't have anything to do with it."

Another prisoner not involved in this case, Arlene Franckewitz, was also in a holding cell in the Mecklenburg County jail during this trial. She testified that she had overheard the conversation between Martin and Boulware in which he had told her he would testify that she was not a party to what he had done. Deputy Sheriff Marcellus Brown, who "worked the court rooms," testified that on two occasions while he was escorting Martin be-

tween the jail and the courtroom Martin had told him he was going "to take down the fat bitch who carried them to this place" although she thought they were only going to the Supermarket to buy beer.

Notwithstanding Martin's testimony the jury found defendant Boulware not guilty of murder in the first degree and acquitted her of any complicity in the attempted robbery of Jimmy's Supermarket. Defendant Foster, however, was found guilty of first-degree murder, and Judge Friday adjudged that he be imprisoned for "the remainder of his natural life."

Additional facts pertinent to the decision will be stated in the opinion.

*Rufus L. Edmisten, Attorney General and Jane Rankin Thompson, Associate Attorney for the State.*

*Shelley Blum for defendant appellant.*

SHARP, Chief Justice.

[1] Defendant brings forward seven assignments of error. We consider first his assignment No. 4, which is the basis for his assertion that "the major question presented by this appeal" is whether the trial judge erred in refusing to direct a verdict of not guilty as to defendant Foster after the jury had acquitted defendant Boulware. Defendant Foster stresses the fact that although the State's case against both defendants Foster and Boulware depended upon the testimony of Martin, who implicated them both in the attempted robbery, the jury acquitted Boulware and "convicted Foster on the same testimony." He argues that if the jury disbelieved Martin with reference to Boulware's participation in the crime, then logic also required them to reject his testimony as to Foster's complicity. This contention has no merit, and it is overruled.

While it is true that the State's case against both defendants rested upon Martin's testimony, it is not true that the jury was required to accept his testimony either in its entirety or not at all. Further, Boulware offered evidence tending to show that she was not a knowing accomplice to the attempted robbery.

In this State the maxim *falsus in uno, falsus in omnibus* is not to be used as a rule of law by which evidence is withdrawn

from the jury as if the witness were incompetent. It is merely a permissive aid in weighing and sifting evidence. *State v. Williams*, 47 N.C. 257 (1855). *See Ferrall v. Broadway*, 95 N.C. 551, 557-58 (1886); Black's Law Dictionary 727 (4th Ed. 1951). More than a century ago, speaking through Justice Rodman, this Court approved the trial judge's charge that "the rule *'falsus in uno, falsus in omnibus'* does not prevail in this State; that the jury could believe a part, all, or none of the testimony, and that it was a question of credit, of which they were the sole Judges." *State v. Brantley and Watkins*, 63 N.C. 518 (1869). The substance of that portion of the charge quoted above has been a standard part, a *sine qua non*, of the trial judge's charge during the memory of any lawyer now alive. As Chief Justice Smith said in *State v. Hardee*, 83 N.C. 619, 622 (1880): "Even the clear perjury of a witness committed on the trial does not authorize the court to direct the jury to disregard the testimony, but it goes to his credit only."

Upon the evidence in this case the jury would have been fully justified in finding both Boulware and Foster guilty as charged. It is equally clear that the two differing verdicts rendered can be explained on a rational basis. We note, however, the following statement from Annot., 22 A.L.R. 3d 717, 721 (1968): "[M]ost modern courts are agreed that the verdicts as between two or more defendants tried together in a criminal case need not demonstrate rational consistency. . . .

"Of course, if the court determines that the verdicts are actually consistent notwithstanding defendant's attack upon them, affirmance will result regardless of the court's views respecting the necessity for consistency. Such a determination may be made where, considering the facts and circumstances disclosed, the verdicts can be explained on some rational basis or where the evidence adduced against the one defendant was different from or weaker than that adduced against the other." *See also State v. Meshaw*, 246 N.C. 205, 207, 98 S.E. 2d 13, 15 (1957).

Assignments of error 1, 2, and 3 challenge the court's rulings admitting certain evidence over defendant's objection.

[2]  On direct examination Martin was permitted to testify that while he, Foster, Williams, and Boulware sat in her mother's car at the home of Joyce Pettus, Williams said "that down there is a

store 'we can rob for some money' . . . that he had cased it out earlier." Defense counsel objected on the ground that Williams' statement was hearsay. The objection was overruled and assignment No. 1 is based on this ruling. It is without merit.

Defendant, who admitted being in the store when the attempted robbery and murder took place, based his defense to the charge of murder on his lack of knowledge that Williams and Martin planned to rob the store and his lack of participation in the plot or its attempted execution. Thus, Williams' challenged statements were competent to prove defendant's knowledge that Boulware, Martin, and Williams planned to rob Jimmy's Supermarket. 1 Stansbury's N.C. Evidence § 83 (Brandis rev. 1973). Notwithstanding, had the admission of this testimony constituted error it would have been rendered harmless when Martin, without objection, thereafter gave substantially identical testimony both on direct and cross-examination. *State v. Sanders*, 288 N.C. 285, 218 S.E. 2d 352 (1975), *cert. denied*, 423 U.S. 1091, 96 S.Ct. 886, 47 L.Ed. 2d 102 (1976).

[3] Defendant's assignment No. 2 charges that the trial judge erred in permitting the jury to view the scars from the wounds which, Martin testified, Small had inflicted upon him with a butcher knife at the time he shot Small. These scars were illustrative of relevant and material testimony. Their exhibition to the jury, therefore, was not error. 1 Stansbury's N.C. Evidence § 119 (Brandis rev. 1973). *See also State v. Barrow*, 276 N.C. 381, 172 S.E. 2d 512 (1970).

Assignment No. 3 is directed to an allegedly leading question. The record discloses that this question was both timesaving and harmless. *See State v. Cox* et al, 281 N.C. 275, 188 S.E. 2d 356 (1972); *State v. Johnson*, 272 N.C. 239, 158 S.E. 2d 95 (1967). In his brief defendant concedes that the rulings challenged by assignments 2 and 3 were on matters "committed to the discretion of the trial court." He suggests no abuse of discretion and there obviously was none. Both assignments are overruled.

[4] The substance of defendant's assignment No. 5 is that the trial judge erred by allowing the district attorney to question defendant and his witness Franckewitz about their respective criminal convictions and specific acts of misconduct. This assign-

ment is based upon an objection which the record reports as follows:

"Mr. Blum: I object to continuing along this line of questioning. (The district attorney was reading from arrest records.)

"Court: He can cross examine him."

In his brief defendant argues that to permit the district attorney to cross-examine a witness about convictions while referring to an arrest record is to permit him to insinuate that he "has a long arrest record and is not telling the truth about it." This argument, if carried to its logical conclusion, would prevent the prosecuting attorney from using any unidentified notes while cross-examining a witness. At the time the district attorney was cross-examining defendant the record contains no suggestion that the jury knew the nature of the paper the district attorney was using. Later, when examining Franckewitz, defense counsel himself identified the paper in making the following objection: "Your Honor, I object to the use of unconfirmed arrest records not reduced to conviction, as we have objected before, in use in impeachment. I believe that an arrest record has no meaning." The court's response was, "Objection overruled. He can ask if she committed the acts. Go ahead."

When the examinations were completed defendant had admitted that he had been convicted of the possession of marijuana in January 1976, of receiving stolen goods in 1975, and of resisting arrest in 1974. He had denied that he had robbed Robert Owens in 1976 and that he had ever committed larceny from the Charlottetown Mall. Franckewitz had admitted that in 1971 she had written four worthless checks in Florida and fifteen in Charlotte in 1974. She denied that she had ever been convicted of embezzlement.

A defendant who elects to testify in his own behalf knows that he is subject to impeachment by questions relating not only to his conviction of crime but also to any criminal or degrading act which tends to discredit his character and challenge his credibility. Such questions, however, must be asked in good faith. It would be highly improper for the prosecuting attorney to ask a witness an impeaching question without reasonable grounds for belief that the witness had committed the crime or degrading act about which he was inquiring. *State v. Williams,* 292 N.C. 391, 233

S.E. 2d 507 (1977); *State v. McKenna*, 289 N.C. 668, 224 S.E. 2d 537, *death sentence vacated*, 429 U.S. 912, 97 S.Ct. 301, 50 L.Ed. 2d 278 (1976); *State v. Gainey*, 280 N.C. 366, 185 S.E. 2d 874 (1972); *State v. Williams*, 279 N.C. 663, 185 S.E. 2d 174 (1971). *See* 1 Stansbury's N.C. Evidence § 112 (Brandis rev. 1973).

Whether the cross-examination transcends propriety or is unfair is a matter resting largely in the sole discretion of the trial judge, who sees and hears the witnesses and knows the background of the case. His ruling thereon will not be disturbed without a showing of gross abuse of discretion. *State v. Daye*, 281 N.C. 592, 189 S.E. 2d 481 (1972). This record evinces neither bad faith on the part of the district attorney nor any attempt to badger or humiliate the witness. Assignment No. 5 is overruled.

Assignment No. 6, that the court erred in overruling defendant's objection to an "argumentative question," is frivolous. The question combined two related queries and was, therefore, bad form. Nevertheless defendant understood the question perfectly. He answered it favorably to himself and the district attorney dropped the matter without further ado.

[5] Defendant's final assignment, No. 7, relates to his sentence of life imprisonment. Upon the coming in of the verdict defense counsel requested the court to sentence defendant "as a youthful offender." Whereupon Judge Friday entered judgment which, *inter alia*, provided:

"The jury having found the defendant guilty of the offense of felony murder which is a violation of G.S. 14-17 and of the grade of felony;

It is ADJUDGED that the defendant be imprisoned for the term of the remainder of your natural life in the North Carolina Department of Correction. It is ordered that the defendant be given credit on this sentence for 113 days spent in custody pending trial."

After announcing the foregoing judgment, Judge Friday stated, "Now, as the court understands it, this life sentence will be served as a committed youthful offender; at least that is, to my knowledge."

This judgment did not specify that defendant was committed to the custody of the Secretary of Correction for treatment and

supervision under N.C. Gen. Stats., Ch. 148, Art. 3A (1975 Cum. Supp.), "Facilities and Programs for Youthful Offenders." Notwithstanding, in view of the court's statement that he understood defendant's life sentence would be served as a "committed youthful offender," defendant contends the case should be remanded to the Superior Court "for correction" in accordance with the trial judge's intention that defendant be confined only "for up to four years and must then be paroled." From this record we are unable to divine the trial judge's intention. However, his intention is rendered immaterial by our decision in *State v. Niccum*, 293 N.C. 276, 238 S.E. 2d 141, filed 11 October 1977. In *Niccum* we held that neither N.C. Gen. Stats., Ch. 148, Art. 3A, §§ 148-49.1 through 148-49.9 (repealed 1 October 1977) nor its substitute, N.C. Gen. Stats., Ch. 148, Art. 3B, §§ 148-49.10 through 148-49.16 (effective 1 October 1977) was intended to apply to a youthful offender who commits a crime for which death or a life sentence is the mandatory punishment.

Judge Friday properly imposed upon defendant the mandatory sentence of life imprisonment, and in his trial we find no error.

However, there is one matter which we must consider *ex mero motu*. Defendant was indicted in a bill drawn under G.S. 15-144 for first-degree murder as defined by G.S. 14-17 (Cum. Supp. 1975). This statute declares, *inter alia*, that any murder "which shall be committed in the perpetration or attempt to perpetrate any . . . robbery . . . shall be deemed murder in the first degree." Evidence for the State tended to show that defendant intentionally and voluntarily participated with three other persons in an unsuccessful attempt to rob Jimmy's Supermarket; that in the attempt one of his co-conspirators shot Mr. Small, who died approximately two weeks later from the wounds then inflicted. This evidence, which the jury found to be true, established defendant's *guilt of murder in the first degree. State v. Peplinski*, 290 N.C. 236, 225 S.E. 2d 568, *cert. denied*, 429 U.S. 932, 97 S.Ct. 339, 50 L.Ed. 2d 301 (1976); *State v. Woodson*, 287 N.C. 578, 215 S.E. 2d 607 (1975), *rev'd on other grounds*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed. 2d 944 (1976). However, in response to the written issue submitted by the trial judge the jury returned a verdict of "guilty of felony murder."

[6]   The term "felony murder" is an abbreviation for a homicide committed in the commission of or attempt to commit a felony such as specified in G.S. 14-17. Any felony "which is inherently dangerous to human life, or foreseeably dangerous to human life due to the circumstances of its commission, is within the purview of G.S. 14-17." *State v. Williams*, 284 N.C. 67, 72, 199 S.E. 2d 409, 412 (1973). "Felony murder" is a term well understood, and frequently used, by both bench and bar. By statute in this State, however, murder is either murder in the first degree or murder in the second degree, and the punishment specified for murder is for each degree respectively. Notwithstanding, since "felony murder" is not a statutory term, its use in an issue submitted to the jury is ill-advised and we expressly disapprove its usage. It is a misnomer which will, of course, be reflected in the verdict whenever it is so used.

In *State v. Lee*, 292 N.C. 617, 626, 234 S.E. 2d 574, 579 (1977), the trial judge, in his charge, submitted to the jury the issue of defendant's guilt of "first-degree murder when a deadly weapon is used." In disapproving this instruction, which we held to be prejudicial error, Justice Branch, writing for the Court, said: "This instruction creates a new offense without benefit of statute or court decision."

[7]   In this case, however, the ambiguity in the issue and verdict is cured by the charge, to which no exception is taken. "A verdict, apparently ambiguous, 'may be given significance and correctly interpreted by reference to the allegations, the facts in evidence, and the instructions of the court' . . . . 'The verdict should be taken in connection with the charge of his Honor and the evidence in the case.'" (Citations omitted.) *State v. Tilley*, 272 N.C. 408, 416, 158 S.E. 2d 573, 578 (1967).

After telling the jury that defendants were indicted under G.S. 14-17 and reading the statute to them, Judge Friday explained that "under this statute, any killing of a human being by a person committing or attempting to commit armed robbery is first-degree murder without anything further being shown." Thereafter he several times charged the jury in words substantially as follows: If you find from the evidence beyond a reasonable doubt that on 17 August 1976 defendants Boulware and Foster accompanied Martin and Williams to Jimmy's Supermarket for the avowed purpose of robbing that store; that while

they were there, aiding and abetting each other in attempting to perpetrate the robbery, one of them shot the attendant Small; and that subsequently Small died in consequence of the shooting, those facts "would make them all equally guilty and make them guilty of murder in the first degree." In his final mandate the judge again instructed the jury that if they found the facts postulated in the preceding sentence "from the evidence and beyond a reasonable doubt" they "would return a verdict of murder, that is, guilty as to the first issue submitted to you, guilty of felony murder."

Construing the verdict, "guilty of felony murder," with reference to the charge we have no doubt that it can only be interpreted as a verdict of guilty of murder in the first degree. For that reason, albeit we condemn the use of the term "felony murder" in an issue and verdict, we find no prejudicial error in the trial and affirm this verdict. In doing so, however, we strongly recommend to the trial judges that in instructing the jury as to permissible verdicts they abstain from innovations.

No error.