David B. FOSTER, Petitioner,

v.

Robert O. BARBOUR, Respondent.

No. C–C–78–101.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Oct. 17, 1978.

Shelley Blum, Charlotte, N. C., for petitioner.

Richard N. League, Asst. Atty. Gen., Dept. of Justice, Raleigh, N. C., for respondent.

## ORDER GRANTING WRIT OF HABEAS CORPUS

McMILLAN, District Judge.

On August 17, 1976, between 8:30 and 9:00 p. m., Jimmy Small, owner of Jimmy's Market on Old Statesville Road north of Charlotte, was fatally shot during an attempted robbery of his store. In prosecutions arising out of the attempted robbery and killing, the State contended that four persons—Kenneth Charles Martin, Ernest Williams, Annette Boulware, and petitioner David Bernard Foster—jointly planned and participated in the crime.

On January 24, 1977, petitioner was convicted in Mecklenburg County Superior Court on a charge of first degree murder and sentenced to life imprisonment. He and Annette Boulware were tried together on a felony murder theory. Boulware was acquitted. The case was tried before a jury with the Honorable John Friday presiding. Petitioner's conviction was affirmed by the North Carolina Supreme Court in an opinion reported at 293 N.C. 674, 239 S.E.2d 449 (1977).

There were several witnesses to the attempted robbery and shooting. None of them could identify any of the participants except Kenneth Martin. It is undisputed that Martin was the one who shot Small after a scuffle in the back of the store. Martin was himself wounded in the fight and was bleeding profusely when he left the store. On August 21, 1976, after his arrest, Martin gave the police an oral statement, later reduced to writing, which implicated Williams, Boulware, and petitioner in the crime. He later negotiated a deal with the district attorney whereby in exchange for his testimony against the others he would be charged with *second degree* murder instead of first degree murder.

The State's case against both petitioner and Boulware depended entirely on the testimony of Martin. Martin testified that in the early evening of August 17 he, Boulware, and petitioner were at a party at a friend's home in Charlotte. The three left at about 8:30 p. m. to get some beer and were joined outside the house by Ernest Williams. All four got into an automobile driven by Boulware but belonging to her mother. While in the car Boulware and Williams allegedly began reminiscing about a robbery they had committed together, and Williams suggested they could rob Jimmy's Market. Martin testified that he, Williams, and petitioner were all armed and that after the suggestion by Williams they all decided to rob Small's store.

At the store Boulware parked the car and the three men went inside and assembled at a restroom in the back of the store. Martin was to remain at the back and watch Small, who was behind the meat counter; Williams was to guard the door; and petitioner was to cover the cash register. (At trial the cash register operator was not able to identify petitioner.) Martin became involved in a scuffle with Small and shot him after Small stabbed Martin with a butcher knife.

Martin testified that after the shooting the three men fled the store and that Boulware drove them back toward Charlotte. When she discovered that Martin was bleeding, Boulware insisted that he leave the car. Boulware pulled into an abandoned service station where Williams got out of the car and ran off. Martin did not want to leave the car, but he was kicked out into a ditch by petitioner. Petitioner then left the car and went off in a direction opposite that taken by Williams. Boulware drove away and Martin was left to make his way back to Charlotte as best he could.

On cross-examination Martin admitted that he was angry with petitioner for pushing him out of the car and that his testimony was in part motivated by a desire for revenge. Record on Appeal, p. 38. He also acknowledged that after petitioner's arrest he had written petitioner and told petitioner that he would "take the rap" and "cut [petitioner] loose." Record on Appeal, p. 37.

Petitioner did not deny that he went to Small's store with Martin, Williams, and

Boulware. He did deny that he knew anything about the robbery. His version of the events was that in the early evening of August 17, Martin approached him at a basketball court where petitioner had been playing and proposed that the two of them smoke some marijuana. Petitioner agreed and went with Martin to Boulware's car nearby where Williams and Boulware were already sitting. Petitioner stated that he was told they were going to the store to buy some kerosene for Boulware's mother. After they had stopped at one store which was closed, Williams suggested that they go to Jimmy's Market and Boulware agreed. However, when the four arrived at the store and discovered it did not sell kerosene, Boulware stayed in the car.

Petitioner contended that he went into the store to buy some canned goods, that he was not armed, and that when he heard the shots in the back of the store and realized what was happening he fled the store and returned to Boulware's car, telling her that Martin and Williams were robbing the store. Before they could leave, however, Martin and Williams came out of the store and got into the car. Petitioner testified that Williams held a gun to Boulware's head and forced her to drive them back toward Charlotte.

Petitioner's story was corroborated in important particulars by the testimony of Annette Boulware. A major disputed point was whether the robbery had been discussed and planned in the presence of Boulware and petitioner. Proof of their involvement in the robbery and thus of their liability for the killing depended on showing that they had knowledge of the plan and cooperated in its execution. Both petitioner and Boulware denied there was any talk of a robbery while they were in the car with Martin and Williams. *The jury apparently believed Boulware's contention that she did not know about the robbery*; it was not so charitable toward petitioner, despite the fact that there was no testimony from Martin that he had discussed the robbery with petitioner at any time before petitioner got into Boulware's car!

In this petition Foster seeks relief on two grounds: (1) that the district attorney was permitted to cross-examine him and another defense witness about charges and alleged crimes which had not resulted in convictions, and (2) that he was sentenced to life imprisonment as a committed youthful offender but that a subsequent North Carolina Supreme Court decision deprived him of that status in violation of the due process and *ex post facto* clauses. He has exhausted state remedies on both claims by direct appeal.

I.

Petitioner's first claim is almost identical to that presented in *Foster v. Watkins*, 423 F.Supp. 53 (W.D.N.C.1976), aff'd., 570 F.2d 501 (4th Cir. 1978). As in *Foster v. Watkins*, petitioner here claims that the district attorney's bad faith questioning about alleged prior offenses damaged his credibility and seriously prejudiced his defense.

Petitioner contends and respondent does not deny that during the disputed cross-examination the district attorney had in front of him a series of arrest records to which he referred while asking his questions. *See* Record on Appeal, p. 75. These records have been furnished for the court's examination. They show the following.

On March 19, 1975, two larceny warrants were issued against petitioner charging thefts from two stores located at the Charlottetown Mall in Charlotte. The district attorney took a *nolle prosequi* with leave to reopen in one case and a motion to dismiss was allowed in the other case after petitioner pleaded not guilty.

On March 25, 1976, a warrant for petitioner's arrest was issued charging him with the robbery of one Robert Owens. The charge was dismissed by the prosecutor because Owens would not come to court.

On December 5, 1975, petitioner was charged with the theft of four automobile tires on December 2, 1975. Again, the prosecutor took a voluntary dismissal in the case.

On May 21, 1975, petitioner was charged with receiving a stolen horse. This charge was *nol prossed* with leave to reopen.

On October 24, 1974, petitioner was charged with trespassing at Charlotte Memorial Stadium and with resisting an officer who arrested him for trespassing. In both these cases the prosecutor took a *nolle prosequi* with leave to reopen.

None of the foregoing cases resulted in conviction, and none proceeded beyond the preliminary hearing stage.

Petitioner did plead guilty to the misdemeanor of possession of marijuana on February 13, 1976, and he also pleaded guilty to the misdemeanor of receiving stolen goods on February 4, 1976.

Petitioner took the stand at trial in his own defense to rebut the version of events offered by the prosecution through Kenneth Martin. During the cross-examination of petitioner the district attorney, based on the petitioner's record outlined above, conducted the following inquiry:

"Q. You have been convicted of larceny. Is that correct?

"A. No.

"Q. You have been convicted of larceny from different stores here in Charlotte?

"A. No.

"Q. On four different occasions?

"A. No.

"Q. Let's see, your date of birth is—

"MR. BLUM: I object to continuing along this line of questioning. (The district attorney was reading from arrest records.)

"COURT: He can cross examine him.

"Q. Your date of birth is March first, 1958?

"A. That's right.

"Q. And your address is on Tinnin Street?

"A. It was.

"Q. And also used to be on Ambassador Street, 517?

"A. True.

"Q. You robbed Robert Owens?

"A. No.

"Q. March 25 of 1976?

"A. No.

"Q. At 9:40 in the evening?

"A. I was picked up as a suspect. He identified me and said that I wasn't the man that robbed him.

"Q. You were in possession of marijuana in January of '76, too, weren't you?

"A. Yes.

"Q. Received stolen goods in December of '75?

"A. I was at a house, at my cousin's house, and my other cousin brought some tires and I got arrested for it.

"Q. Resisted arrest in October of '74, October 24 of '74?

"A. Yes.

"Q. Stole two more times, larceny from Charlottetown Mall in March of '75, March 19 of 1975?

"A. No.

"Q. You were living on East Sixth Street then?

"A. No.

"Q. 606 East Sixth Street?

"A. No.

"Q. You deny you lived there?

"A. I lived there, but it wasn't me.

"Q. You lived there but it wasn't you?

"A. That's right."

Record on Appeal, pp. 75–76.

A comparison of the answers given by petitioner and his prior record as recounted above shows that each of his answers was consistent with the actual disposition of the charges stated by the district attorney. Questions about the robbery and larceny charges were especially prejudicial since they related to offenses similar to that involved in petitioner's trial.

■ In *Foster v. Watkins, supra,* one of the six charges about which the defendant was questioned had been dismissed before trial. The court of appeals commented: "This fact alone sned doubt on the prosecutor's good faith." 570 F.2d at 506. Here not one but *three* of the larceny and robbery charges had been dismissed, and the

remaining larceny charge had been *nol prossed*. Bad faith is clearly shown.

The quoted portion of the cross-examination was not harmless. *See Foster v. Watkins, supra* at 506 n.6. While the evidence against petitioner was unquestionably stronger than the comparable evidence against the defendant in *Foster v. Watkins, supra*, the only evidence directly implicating petitioner in the planning and execution of the robbery of Small's store came from Kenneth Martin. The trial was a test of Martin's credibility against petitioner's. As noted above, Martin's testimony was not unshakeable; he admitted a motive for wanting to "get" petitioner, and he had an obvious interest in the outcome of the trial. The jury plainly did not believe Martin's testimony in regard to the defendant Boulware; in particular, it apparently did not believe Martin's claim that the robbery had been discussed and planned in the car while riding to Small's store and that Boulware was fully aware of the plan.

The effect of the prosecutor's cross-examination is no different from the effect condemned in *Foster*:

". . . [H]is questions alone, although answered in the negative by Foster, must have left an indelible impression on the minds of the jury. Foster's entire defense rested on his credibility, and thus the prosecutor's attack on this credibility was critical. Foster's denial of the prosecutor's insinuations in theory should have left his credibility intact but in actuality could not erase the blemish on his character which had been left in each juror's mind."

570 F.2d at 506.

Petitioner is entitled to a new trial at which no reference is made to any of the charges dismissed or *nol prossed* and not reopened.

(Petitioner contends that the district attorney also improperly questioned a defense witness, Arlene Franckewitz, about an alleged conviction for embezzlement. Record on Appeal, pp. 92–93. Ms. Franckewitz' testimony directly supported Boulware's defense and not petitioner's, but the testimony also casts doubt on Kenneth Martin's credibility and motives, thus indirectly bolstering petitioner's case. Because there is no evidence in the record about the factual basis for the questioning of Ms. Franckewitz, the court is unable to form any opinion on the propriety of the inquiry.)

## II

After the jury returned its verdict the court considered sentencing, and the following dialogue occurred:

"MR. BLUM: Your Honor, I have read the Youthful Offenders Statute [N.C.G.S. §§ 148–49.1 through 148–49.9 (1967)], and I see nowhere in there where it says that a person cannot be sent with a life sentence as a youthful offender, and I respectfully ask the court to do that. . . .

. . . . .

"COURT: All right. All right, Mr. Foster, stand up, please. This is in 76CR52497. The jury having returned a verdict of guilty of felony murder, it is the judgment of this court that you will be confined in the North Carolina Department of Correction for the remainder of your natural life. . . .

. . . . .

"COURT: Now, as the court understands it, this life sentence will be served as a committed youthful offender; at least that is, to my knowledge."

Record on Appeal p. 108. The formal judgment and commitment, signed by Judge Friday on January 24, 1977, made no express mention of a sentence as a committed youthful offender.

On appeal petitioner asked for a remand to the Superior Court for correction of the judgment to reflect the trial court's intention of sentencing petitioner as a committed youthful offender. The State did not oppose a remand for this purpose and did not contend on appeal that youthful offender status was unavailable to petitioner because of his conviction of a crime carrying a life sentence. The North Carolina Supreme Court disposed of this issue as follows:

"From this record we are unable to divine the trial judge's intention. However, his intention is rendered immaterial by our decision in *State v. Niccum,* 293 N.C. 276, 238 S.E.2d 141, . . . filed 11 October 1977. In *Niccum* we held that neither N.C.Gen.Stats., Ch. 148, Art. 3A, §§ 148–49.1 through 148–49.9 (repealed 1 October 1977) nor its substitute, N.C.Gen. Stats., Ch. 148, Art. 3B, §§ 148–49.10 through 148–49.16 (effective 1 October 1977) was intended to apply to a youthful offender who commits a crime for which death or a life sentence is the mandatory punishment."

293 N.C. at 686, 239 S.E.2d at 457.

The cited decision in *State v. Niccum* was handed down after petitioner's *trial* and about two months before petitioner's own *appeal* was decided. The correctness of *Niccum*'s holding is a matter of state law not open to challenge in this habeas corpus proceeding. The issue raised by petitioner is whether the application of *Niccum* to this case deprived him of due process of law, by analogy to the *ex post facto* clause, in that it increased the quantum of punishment applicable to persons convicted of certain crimes and who would otherwise have been eligible for sentencing as committed youthful offenders. (It is not disputed that but for the principle announced in *Niccum,* petitioner would have been eligible for committed youthful offender status.)

▆▆▆ Had the North Carolina Supreme Court concluded that petitioner did not *in fact* receive a sentence as a committed youthful offender, he would have had no standing to complain here. However, the Supreme Court did not resolve the ambiguity in the trial court's sentence but based its decision on the broader ground provided by *Niccum.* Since petitioner is entitled to a new trial by virtue of his first claim, the correct interpretation of the original sentence is now immaterial. However, the decision to grant petitioner a new trial does not moot the second claim since it is possible that he will again be convicted and again seek sentencing under the provisions of the committed youthful offender stat-

utes. The issue does not disappear simply because *Niccum* has been decided between the time of petitioner's first trial and his new trial; petitioner had a right to be tried and punished under the law as it stood at the time of his alleged crime, and this right is not affected by his success in obtaining a new trial.

At the time of petitioner's sentencing there had been no judicial construction of the scope of N.C.G.S. §§ 148–49.1 *et seq.* Nor was there any legislative history to guide prosecutors, defendants or judges. The stated statutory purpose was ". . . to provide the courts with an additional sentencing possibility to be used in the court's discretion. . . ." *Id.* No words of limitation appear in the statute to confine its reach to persons convicted of certain crimes and not of others. The sentencing provision of the statute, as it stood at the time of petitioner's conviction, stated:

"§ 148–49.4. Sentencing a youthful offender.—When a youthful offender is convicted of an offense punishable by imprisonment, and the court does not suspend the imposition or execution of sentence and place the offender on probation, the court may, in lieu of the penalty of imprisonment otherwise provided by law, sentence the youthful offender to the custody of the Commissioner of Correction for treatment and supervision pursuant to this Article until discharged at the expiration of the maximum term imposed or until conditionally released or unconditionally discharged by the Board of Paroles as provided in this Article. At the time of commitment the court shall fix a maximum term not to exceed the limit otherwise prescribed by law for the offense of which the person is convicted. When the maximum permitted penalty for the offense is imprisonment for one year or longer, the maximum term imposed shall not be for less than one year. If the court shall find that the youthful offender will not derive benefit from treatment and supervision pursuant to this Article, then the court may sentence

the youthful offender under any other applicable penalty provision."

The statute contemplates that youthful offenders will sometimes receive probation or a suspended sentence, but these two options are not available to persons convicted of murder and sentenced to life imprisonment. N.C.G.S. § 15–197; see also N.C.G.S. § 15A–1331 (effective July 1, 1978). Nonetheless, there is nothing in the statute to suggest that committed youthful offender status is available *only* to persons convicted of crimes for which sentence may be suspended or for which probation is available.

The sentencing option under §§ 148–49.1 *et seq.* is clearly more advantageous to petitioner than the standard life sentence. As a committed youthful offender he would be eligible for *mandatory* parole no later than four years after the commencement of his sentence. N.C.G.S. § 148–49.8(b), while as a regular offender serving a life sentence he would have to wait twenty years for parole *consideration*. N.C.G.S. § 148–58; see also N.C.G.S. § 15A–137 (effective July 1, 1978).

*Niccum* did not purport to change settled law, but it did adopt a novel construction of a statute not foreshadowed in earlier decisions under the statute or compelled by the language of the statute itself. It is true that the North Carolina Supreme Court had consistently construed the State's punishment for first degree murder to require the maximum penalty constitutionally permissible. See *State v. Davis*, 290 N.C. 511, 227 S.E.2d 97 (1976); *State v. Waddell*, 282 N.C. 431, 194 S.E.2d 19 (1973). Nothing in these decisions could be construed to give fair notice that the legislatively designated "additional sentencing possibility" would be unavailable for youthful offenders convicted of murder and not sentenced to death.

Application of *Niccum* to petitioner's case requires the same scrutiny as would be given to an *ex post facto* modification of the criminal law. *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); *see also Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977); *United States v. Wasserman*, 504 F.2d 1012 (5th Cir. 1974). In *Bouie* the

petitioners had been charged with criminal trespass which, under South Carolina law, was understood to apply to the entry upon property of another after receiving notice not to enter. The petitioners, sit-in demonstrators at a lunch counter, defended their prosecutions by contending that they had not received notice until they were already on the premises and thus their refusal to leave did not come within the definition of criminal trespass. The South Carolina Supreme Court, however, construed the crime of criminal trespass to include *staying* on the premises after notice as well as entry onto the premises after notice. This decision had not been anticipated by any of the prior pronouncements of the South Carolina Supreme Court.

The Supreme Court reversed petitioners' convictions, relying on the due process concept of fair notice. The Court also found indirect support in the *ex post facto* clause:

> ". . . [A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids. . . . If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction."

378 U.S. at 353–54, 84 S.Ct. at 1702.

There is nothing to distinguish the present case from *Bouie*. It is not material that the effect of *Niccum* was to make the punishment applicable to petitioner's offense more onerous and not, as in *Bouie*, to create a new criminal offense. The *ex post facto* clause and its due process analogue protect against legislative and judicial acts which "make more burdensome the punishment for a crime after its commission." *Dobbert v. Florida*, 432 U.S. 282, 292, 97 S.Ct. 2290, 2297, 53 L.Ed.2d 344 (1977), quoting *Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 70 L.Ed. 216 (1925). Nor is the effect of *Niccum* merely procedural. *Dobbert, supra*, at 293, 97 S.Ct. 2290. As noted above, the effect of *Niccum* was

clearly unfavorable since it removed the most favorable sentencing option available to the trial court.

Petitioner is not "complaining in the abstract" about a judicial construction which could not have affected him. *Dobbert, supra* at 300, 97 S.Ct. 2290. He is not prevented from challenging the application of *Niccum* to his case simply because the sentence he is now serving would have been a permissible sentence at the time of his trial. *Id.* The court does not presume to say what petitioner would have done had he known he would not be eligible for committed youthful offender status, but the possibility of prejudice due to the retroactive application of *Niccum* is a real one. Petitioner alleges that he was offered a chance to plead guilty to second degree murder with the recommendation of a forty-year sentence. Had he so pleaded and received a forty-year sentence he would have been eligible for parole consideration after ten years. N.C.G.S. § 148–58. Such a plea arrangement would have been less favorable than a sentence as a committed youthful offender but more favorable than the life sentence he is now serving as a result of the decision in *Niccum*. Respondent has not denied that such a plea offer was made.

For all the foregoing reasons IT IS ORDERED:

1. That the writ of habeas corpus is granted; within sixty (60) days of the filing date of this order the State shall give petitioner a new trial. At the trial petitioner may not be questioned about any of the charges against him which were dismissed or which were *nol prossed* and have not, as of this date, been reopened.

2. That if petitioner is not retried within sixty (60) days, he shall be released from custody.

3. That respondent shall inform the court within forty (40) days of the filing date of this order which course of action respondent intends to follow.

4. That if petitioner is retried and again convicted, he may be sentenced as a committed youthful offender, if the court deems such sentence appropriate under the facts of the case. To the extent that the relevant sentencing provisions have been amended since the date of petitioner's first trial, he may be eligible for sentencing under the new provisions to the extent that they are found to be retroactive as a matter of state law *and* to the extent that any new provisions are *more* favorable to petitioner than the law as it stood at the time of his first trial. *See Dobbert, supra.* Petitioner's sentence upon retrial and conviction must conform to the principles announced in *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

5. That in the alternative, if it should be determined by the Fourth Circuit Court of Appeals on an appeal from this decision that petitioner is not entitled to a new trial on his first claim but that his second claim does warrant relief, then the State shall afford petitioner a new sentencing hearing at which the original sentence may be clarified or modified in accord with the guidelines set out in part II of this order.