STATE OF NORTH CAROLINA v. JOHNNY MACK SWEATT

No. 556A91

(Filed 12 March 1993)

1. **Homicide § 244 (NCI4th)— first degree murder—sufficiency of evidence—premeditation and deliberation**

The trial court did not err in a first degree murder prosecution by denying defendant's motion to dismiss where there was testimony that defendant planned to seek revenge against the victim for calling him a cripple two weeks before the murder; multiple lethal and lesser blows were struck against the victim, who was elderly and intoxicated at the time; a substantial number of the blows were struck after the victim was disabled; and, assuming that the victim called defendant a cripple, this was insufficient to negate premeditation and deliberation. Since defendant was properly found guilty of first degree murder based on malice, premeditation and deliberation, any error relating to defendant's conviction of the same crime on the additional theory of a homicide committed during the commission of a felony or attempt to commit a felony is nonprejudicial.

**Am Jur 2d, Homicide § 439.**

**Insulting words as provocation of homicide or as reducing the degree thereof. 2 ALR3d 1292.**

2. **Homicide § 493 (NCI4th) — first degree murder — instructions — premeditation and deliberation—provocation**

The trial court did not err in its instruction on premeditation and deliberation in a first degree murder prosecution. Although defendant argues that the instruction amounted to placing the burden on a defendant to produce evidence of provocation, those contentions were rejected in State v. Handy, 331 N.C. 515.

**Am Jur 2d, Homicide §§ 501, 508.**

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.**

**Homicide: presumption of deliberation or premeditation from the fact of killing. 86 ALR2d 656.**

STATE v. SWEATT

[333 N.C. 407 (1993)]

**3. Homicide § 498 (NCI4th) — first degree murder — instructions — use of term "felony murder"**

The trial court did not err in a first degree murder prosecution by using the term "felony murder" in its instructions to the jury. Although the use of the term was disapproved in *State v. Foster*, 293 N.C. 674, the jury in that case returned a verdict of guilty of felony murder rather than guilty of murder in the first degree. The jury in this case returned a verdict of guilty of first degree murder under the first degree felony murder rule with robbery with a dangerous weapon and arson being the underlying felonies.

**Am Jur 2d, Homicide §§ 498, 499.**

**Modern status of law regarding cure of error, in instruction as to one offense, by conviction of higher or lesser offense. 15 ALR4th 118.**

**4. Evidence and Witnesses § 1235 (NCI4th) — first degree murder — defendant's statements — not custodial interrogation**

The trial court did not err in a first degree murder prosecution by denying defendant's motion to suppress his statement to an officer while being treated for injuries sustained in an automobile accident. *Miranda* warnings are required prior to questioning only if one is in custody or has been deprived of one's freedom of action in a significant way. Although defendant had been injured in a high speed automobile crash and was in a hospital treatment room when questioned, defendant's own statement to an inmate was that the crash was intentional and for the purpose of supplying defendant with an alibi, so that the presence of police was by defendant's own intentional actions. Defendant points to no overt actions by the officers which show actual custody: defendant's clothing was taken for the purpose of rendering treatment, no police guard was placed at defendant's door to confine him to his room, an officer had to "walk over" about 5 feet to where defendant was being treated when a doctor indicated that officers should talk with defendant, and the officer's inspection of defendant's wallets, given to the officer with defendant's permission, was found to be administrative rather than investigatory.

**Am Jur 2d, Criminal Law § 794.**

STATE v. SWEATT

[333 N.C. 407 (1993)]

**What constitutes "custodial interrogation" within rule of
Miranda v. Arizona requiring that suspect be informed of his
federal constitutional rights before custodial interrogation. 31
ALR3d 565.**

5. **Evidence and Witnesses § 1064 (NCI4th)— first degree
murder—instruction on flight—no error**

The trial court did not err in a first degree murder pros-
ecution in its instruction on flight where the State presented
evidence that, shortly after the victim was murdered, defend-
ant passed an officer on the highway at a very high rate
of speed; flight was a contention of the State, contrary to
defendant's assertion; the instruction makes it clear that flight
is only a contention of the State and does not amount to
an expression of opinion; the trial court expressly instructed
the jury to draw no conclusion concerning judicial opinion;
and it is not fatal that a contention of the State was not
precisely balanced by a contradictory contention of defendant.

**Am Jur 2d, Homicide §§ 486, 492.**

6. **Criminal Law § 750 (NCI4th)— instruction—ascertainment of
truth highest function of trial—burden of persuasion not im-
properly shifted—jurors not confused concerning reasonable
doubt**

The trial court did not err in a first degree murder pros-
ecution by instructing the jury that the highest aim of a criminal
trial is the ascertainment of the truth where the instruction
was taken verbatim from the pattern jury instructions and
the court defined reasonable doubt and repeated the reasonable
doubt standard throughout his jury charge.

**Am Jur 2d, Homicide §§ 482, 484, 510.**

7. **Homicide § 43 (NCI4th)— felony murder—State not relieved
of proving mens rea—not unconstitutional**

The North Carolina felony murder rule is not unconstitu-
tional on the ground that it relieves the State of proving
*mens rea* at the time of the killing.

**Am Jur 2d, Homicide §§ 10, 72, 79.**

Appeal by defendant pursuant to N.C.G.S. § 7A-27(a) from
a judgment imposing life imprisonment entered by Webb, J., at

the 1 July 1991 Criminal Session of Superior Court, Guilford County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 13 January 1993.

*Michael F. Easley, Attorney General, by Jane R. Garvey, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Mark D. Montgomery, Assistant Appellate Defender, for defendant.*

FRYE, Justice.

On 3 December 1990, a Guilford County grand jury indicted defendant for the murder of Robert James Taylor. A superseding indictment for this crime was returned on 10 June 1991. Defendant pled not guilty to the first-degree murder charge and was tried capitally before a jury. The jury returned a verdict of guilty. After a sentencing proceeding held pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of life imprisonment, and defendant was sentenced accordingly. Defendant filed written notice of appeal to this Court on 7 July 1991.

Defendant brings forward seven assignments of error. After considering each of them, we conclude that defendant received a fair trial free of prejudicial error.

The State presented evidence tending to show the following facts and circumstances. Robert James Taylor [hereinafter referred to as Taylor or the victim] was murdered in his home during the early morning hours of 3 November 1990. Taylor had become a resident of Sheraton Towers, a residential high-rise for the elderly in High Point, North Carolina, just two weeks before his death.

Danny Noe testified that on the evening of 2 November 1990, he and defendant were at the Uptown Tavern where they talked and drank together. They eventually went across the street to Colors, a bar, for a final beer before defendant's wife came to pick them up at approximately 11:45 p.m.

William Rolph testified that he saw Taylor and defendant talking and drinking together at the Uptown Tavern on 2 November and later, after the Uptown Tavern closed, he saw Taylor and defendant at Colors. Rolph observed the victim and defendant leave Colors together near closing time. Gary Dalton, the owner of Colors,

also saw Taylor and defendant leave his premises together at approximately 1:30 a.m.

Colors was generally known as a place for individual bartering, and Taylor was known to trade and sell watches. Taylor was always in possession of more than one watch and he habitually carried more than one wallet in both rear pants pockets.

Each of the witnesses who observed Taylor and defendant at the bar had known both of them for varying but considerable periods of time, and each stated that Taylor was a peaceable person. Two of the State's witnesses also commented on defendant's noticeable limp. However, none of the witnesses regarded defendant as being in any manner impaired by alcohol when he and Taylor left the bar on the morning of 3 November 1990.

At approximately 3:00 a.m. on 3 November 1990, Onota Slate, a Sheraton Towers resident, heard a smoke alarm on her floor. When she went down the hallway to investigate, she observed a white male of medium build who appeared to be in his thirties sitting on the couch near the elevator. Ms. Slate continued down the hall and observed that the individual light and sound alarms outside apartment 703 had been activated. She knocked on the door and, receiving no response, pushed the door open. Upon opening the door, Ms. Slate observed thick smoke inside the room. As Ms. Slate returned to her room, she noticed that the person she had seen earlier was gone.

Mildred Styles, also a resident of Sheraton Towers, was in the laundry room when she heard the door from the mezzanine close and the fire alarm sounding. She left the laundry room to see what had happened. Ms. Styles saw an unfamiliar young white male come down the steps, go out the front door of the building and turn toward the center of town. Ms. Styles' description of the stranger was essentially the same as Ms. Slate's description, except Ms. Styles also noticed that the stranger had a severe limp on his left side. During a photographic line-up, Ms. Styles identified defendant as the person she saw leaving Sheraton Towers on the morning of Taylor's death. She also identified defendant in open court.

The High Point Fire Department received the fire call at 2:58 a.m. Fireman Phillip Shields entered apartment 703 and observed

dense, billowing smoke and an open flame. Shields discovered a body on the floor with a large knife protruding from the victim's back.

When Officer Wade Foley of the High Point Police Department was attempting to respond to the fire alarm at Sheraton Towers, he observed a yellow Chevrolet Monte Carlo pass him at a high rate of speed. Officer Foley continued on to the fire call, but prior to reaching Sheraton Towers he received a call at 3:31 a.m. directing him to the scene of a nearby automobile accident. He arrived at the site at 3:44 a.m. and saw what appeared to be a single car accident involving the same Chevrolet Monte Carlo he had seen speeding a few minutes earlier. The accident had occurred roughly two or three miles from Sheraton Towers. When Officer Foley arrived at the scene of the accident, emergency medical personnel were in the process of removing the driver who identified himself as Johnny Sweatt.

Officer Foley proceeded to the hospital where the driver of the vehicle, later identified as defendant, had been taken. During the standard admittance inventory procedure, two hospital workers found four wallets containing identification of two different persons in defendant's pants pockets. Two of the wallets contained identification belonging to Robert Taylor, one of the wallets was empty, and one contained identification of Johnny Mack Sweatt. Defendant initially stated that his name was Johnson and someone had been beating him. Defendant also stated that Robert Taylor had given him the wallets to hold. After obtaining defendant's permission, the hospital personnel gave the wallets to Officer Foley.

Officer Foley looked inside the wallets and discovered that they contained multiple identifications. At the time of Officer Foley's review of the wallets, he was not aware of the incident at Sheraton Towers involving Robert Taylor. Officer Foley called Officer Jeff Insley, a breathalyzer operator, for the purpose of administering a chemical test for intoxication. When Officer Insley arrived at the hospital, he was shown the wallets and he recalled having heard a broadcast requesting information concerning a Robert Taylor. Officer Insley called his lieutenant and was informed of the apparent homicide. At that point, the doctor emerged from the treatment room and stated that defendant was "running off at the mouth" about "things the police should hear."

Officer Insley proceeded to defendant's treatment room and asked him about the wreck and the multiple identifications found

inside the wallets. Defendant told Officer Insley that a David Lee Johnson had given him the wallets to hold, had forced defendant to drive him somewhere, and had held a knife to his throat while bragging about "cutting someone." Defendant admitted that he and the victim had been drinking together earlier and that they had walked back to the victim's residence. Defendant then stopped and indicated that he had nothing else to say.

After defendant was released from the hospital and transported to the police department, he was read his *Miranda* rights and was interviewed for approximately thirty minutes by Detective Beck. Defendant told Beck that he had taken Danny Noe home and, after going to his own home, he had returned to Colors at approximately 12:30 a.m. He also stated that the victim gave him two wallets to hold and they left Colors together. However, when they left together, they went to the vehicle of a person named Johnson and someone hit him in the head. Defendant stated that he remembered nothing else until he saw the fire trucks. He denied going to the victim's residence.

David Lee Johnson, who once lived briefly with defendant and his wife and was the only known associate of defendant by that name, testified that he was in prison on 3 November 1990.

John William Miller, who had been incarcerated with defendant for several months preceding trial, testified that defendant told him that he and the victim had been drinking partners for some time. They had an argument two weeks before the murder during which the victim called defendant a "cripple m----- f----," for which comment defendant decided to exact revenge. Defendant told Miller that he had gone to the Uptown Tavern in the late afternoon of 2 November and that he and the victim had been drinking together most of the night. During the evening, the victim gave defendant "some valuables" to hold before going home because of an unnamed third party the victim did not trust. Defendant stated that he took some of the victim's money thinking that he was too intoxicated to realize the money was missing. However, the victim realized his money was missing and an argument ensued. The victim called defendant a cripple again and said he was going to have him arrested. A scuffle began and defendant grabbed a butcher knife from the kitchen. Defendant told Miller that he "lost it," and began stabbing the victim over and over until the victim's body stopped moving. Defendant then took the wallets and set

the bed on fire to cover the murder. He also wrecked his vehicle in an attempt to acquire an alibi.

The autopsy of the victim disclosed that he was a sixty-one-year-old male, six feet tall and weighed one hundred fifty-five pounds. The medical examiner determined that the victim had suffered numerous blunt impact wounds to his head, face, chest and extremities, which were consistent with a fight. There were thirteen to fourteen stab wounds to the victim's head, chest and back, of which three were potentially fatal. The potentially fatal wounds included a neck wound six inches deep and two six-inch deep stab wounds to the chest which entered the victim's right lung. All three fatal wounds preceded death, and in the opinion of the medical examiner, the victim, who was severely intoxicated, would have survived up to ten minutes after their infliction.

Defendant did not testify. However, the evidence presented by defendant during the guilt phase confirmed that he suffered from a pronounced limp on his left side as the result of a prior stroke, that he left his home again during the early morning hours of 3 November sometime after 12:30 a.m., and that his home was roughly five miles from the victim's residence.

The jury found defendant guilty of murder in the first degree "[o]n the basis of malice, premeditation and deliberation" and on the basis of felony murder with the underlying felonies being robbery with a dangerous weapon and first-degree arson.

[1] In defendant's first argument, he contends that the trial court erred in denying his motion to dismiss. Defendant contends that the evidence was insufficient to support his conviction of first-degree murder on the theory of premeditation and deliberation or that he killed during the course of an armed robbery or arson, therefore his conviction must be set aside.

In ruling on a motion to dismiss, the evidence must be considered in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from the evidence. *State v. Clark,* 325 N.C. 677, 682, 386 S.E.2d 191, 194 (1989). "The test that the trial court must apply is whether there is substantial evidence — either direct, circumstantial, or both — to support a finding that the crime charged has been committed and that defendant was the perpetrator." *Id.*

Murder in the first degree is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation. *State v. McAvoy*, 331 N.C. 583, 589, 417 S.E.2d 489, 494 (1992). Premeditation means the perpetrator thought out the act beforehand for some period of time, however short, but no particular amount of time is necessary. *Id.* at 590, 417 S.E.2d at 494. Deliberation means an intent to kill executed by the defendant in a cool state of blood in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation. *Id.*

The evidence taken in the light most favorable to the State in the instant case tended to show that defendant acted with malice, premeditation and deliberation. Premeditation and deliberation are mental processes which are not ordinarily susceptible of proof by direct evidence. *State v. Olson*, 330 N.C. 557, 565, 411 S.E.2d 592, 596 (1992). Some of the circumstantial factors from which premeditation and deliberation may be inferred are

> (1) absence of provocation on the part of the deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

*Id.*

In the instant case, the State's evidence and the reasonable inferences therefrom demonstrated that defendant had formed a retaliatory intention before the offense occurred. Miller testified that defendant planned to seek revenge on the victim for calling him a cripple two weeks before the murder. The State's evidence also established that multiple lethal and lesser blows were struck against the victim, who was elderly and intoxicated at the time. In addition, a substantial number of the blows were struck after the victim was disabled.

"An unlawful killing is deliberate and premeditated if done as part of a fixed design to kill, notwithstanding the fact that

the defendant was angry or emotional at the time, unless such anger or emotion was strong enough to disturb the defendant's ability to reason." *State v. Hunt,* 330 N.C. 425, 427, 410 S.E.2d 478, 480 (1991). The requirement of a "cool state of blood" does not mean that the defendant must be calm or tranquil. *Id.* Thus, even assuming *arguendo* that the victim did call defendant a cripple, we find this insufficient to negate premeditation and deliberation. Clearly, the evidence of premeditation and deliberation was sufficient to submit first-degree murder to the jury and to support the jury's finding of guilty on that theory.

Since defendant was properly found guilty of first-degree murder based on malice, premeditation and deliberation, any error relating to defendant's conviction of the same crime on the additional theory of a homicide committed during the commission of a felony or attempt to commit a felony is non-prejudicial because defendant can only be sentenced once for the same conviction. Thus, there is no need for us to address the sufficiency of the evidence to establish that the murder was committed during the commission of a felony so as to support the jury finding of guilty of first-degree murder based on the felony murder rule, and we decline to do so.

[2] In defendant's second assignment of error, he contends that the trial court committed reversible error in its instruction to the jury on premeditation and deliberation. The trial court instructed the jury as follows:

Neither premeditation nor deliberation are usually susceptible of direct proof. They may be proved by—they may be proved by circumstances from which they may be inferred, such as the lack of provocation by the victim; the conduct of the defendant before, during and after the killing; use of grossly excessive force; infliction of lethal wounds after the victim is felled; brutal or vicious circumstances of the killing; or the manner in which or means by which the killing was done.

Defendant contends that although the language is intended to distinguish between first- and second-degree murders, it does not. Defendant argues that the instruction fails to distinguish between legal provocation and ordinary provocation, and that the instruction could reasonably be understood by a juror to mean that the State had proven "the lack of provocation," thus the only decision left for the jury was whether this showed premeditation

and deliberation. According to defendant, this amounts to placing the burden on a defendant to produce evidence of provocation in order to avoid conviction.

This Court recently addressed and rejected these same contentions in *State v. Handy*, 331 N.C. 515, 525-26, 419 S.E.2d 545, 551 (1992). Defendant does not raise any additional arguments which were not addressed in *Handy*. We therefore reject this assignment of error.

[3] Next, defendant contends that the trial court erred in using the term "felony murder" in its instructions to the jury. Defendant relies on *State v. Foster*, 293 N.C. 674, 239 S.E.2d 449 (1977), in which this Court disapproved the use of the term "felony-murder" in an issue submitted to a jury. In response to the issue submitted by the trial judge, the jury returned a written verdict of "guilty of felony murder" rather than a verdict of "guilty of murder in the first degree." Since "felony murder" is not a statutory term, the Court said, "its use in an issue submitted to the jury is ill-advised and we expressly disapprove its usage." *Id.* at 687, 239 S.E.2d at 458. In the instant case, in response to written issues submitted by the trial court, the jury returned its verdict finding defendant "guilty of first degree murder . . . B. [u]nder the first-degree felony murder rule with robbery with a dangerous weapon being the underlying felony . . . C. [u]nder the first-degree felony murder rule, the underlying felony being first-degree arson." Thus, the evil condemned by this Court in *Foster* is not present in the instant case. This assignment of error is rejected.

[4] In defendant's fourth assignment of error, he contends that the trial court erred in denying his motion to suppress his statement made to Officer Insley while defendant was at the hospital being treated for injuries sustained in an automobile accident. Defendant observes that the trial court found as a fact that Officer Insley had questioned him. He contends that he was therefore subjected to an unwarned custodial interrogation and that the evidence derived from the interrogation was not constitutionally available to the State.

*Miranda* warnings are required prior to questioning only if one is in custody or has been deprived of one's freedom of action in a significant way. *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706 (1966); *State v. Perry*, 298 N.C. 502, 506, 259 S.E.2d 496, 499 (1979). Whether an individual is in custody for

STATE v. SWEATT

[333 N.C. 407 (1993)]

these purposes is a question of law, to be resolved under the totality of the circumstances. *State v. Corley*, 310 N.C. 40, 47, 311 S.E.2d 540, 545 (1984); *State v. Davis*, 305 N.C. 400, 414-15, 290 S.E.2d 574, 580-81 (1982).

Defendant contends that his statements to Officer Insley were custodial, essentially because he was in a hospital treatment room at the time. He points to no overt actions of the officers themselves which show actual custody. Among the various factors cited by defendant supporting custody is that he had been injured in a high speed automobile crash. According to statements made to a fellow inmate, this crash was intentional and for the purpose of supplying defendant with an alibi; thus the presence of police was assured by his own intentional actions. Defendant was placed in a treatment room, again either necessitated by his own action or at least not because of police-initiated action. The taking of defendant's clothing was for the purpose of rendering proper treatment. When the doctor emerged and talked to the officers, Officer Insley was at the counter and had to "walk over" to where defendant was being treated — approximately five feet away. No police guard was placed at defendant's door to confine him to the hospital room. The officer's inspection of defendant's wallets, originally given to Officer Foley with defendant's express permission, was found by the trial court to be administrative rather than investigatory.

Viewing the totality of the circumstances, we conclude that defendant was not in custody at the time of the limited questioning of defendant by Officer Insley. Thus, *Miranda* warnings were not required and there was no error in denying defendant's motion to suppress.

[5] Next, defendant argues that the trial court erred in its instruction to the jury on flight. The trial court instructed the jury as follows:

> The State contends that the defendant fled. Evidence of flight may be considered by you together with all other facts and circumstances in this case in determining whether the combined circumstances amount to an admission or show a consciousness of guilt. However, proof of this circumstance is not sufficient in itself to establish the defendant's guilt. Further, this circumstance has no bearing on the question of whether the defendant acted with premeditation and deliberation. Therefore, it must not be considered by you as evidence of premeditation and deliberation.

Defendant contends that the instruction was flawed in three respects. First, the instruction assumed that the evidence presented by the State was evidence of flight which is a question for the jury to decide. Second, contrary to the trial court's instruction, the State did not contend to the jury that defendant fled. Third, even if the State had made a contention that defendant fled, the instruction was flawed since the trial court did not give defendant's contentions.

We find no error in the trial court's instruction on flight. The State presented evidence that shortly after the victim was murdered, defendant passed Officer Foley on the highway traveling at a very high rate of speed. This was evidence from which the jury could draw a reasonable inference that defendant fled the scene. Contrary to defendant's assertion, flight was a contention of the State, both as to defendant's immediate actions and his subsequent high-speed removal from the scene of the crime. Since the instruction makes it clear that flight is only a contention of the State, it does not amount to an expression of judicial opinion. *State v. Tucker*, 329 N.C. 709, 723, 407 S.E.2d 805, 813 (1991). The trial court expressly instructed the jury to draw no such conclusion. Also, it is not fatal that a contention of the State was not precisely balanced by a contradictory contention of defendant. *Id.* Defendant's fifth assignment of error is rejected.

[6] Next, defendant contends that the trial court committed plain error in instructing the jury that the highest aim of a criminal trial is the ascertainment of the truth. Defendant argues that the instruction is erroneous as a matter of law because it runs the grave risk of improperly shifting the burden of persuasion to the defendant. We disagree.

The instruction given by the trial judge was taken verbatim from the criminal Pattern Jury Instructions. *See* N.C.P.I.—Crim. 101.36. In addition, prior to the instruction, the trial judge instructed, "[t]he State must prove to you that the defendant is guilty beyond a reasonable doubt." The trial judge also defined reasonable doubt and repeated the reasonable doubt standard throughout his jury charge. As this Court decided in *State v. Garner*, 330 N.C. 273, 296, 410 S.E.2d 861, 874 (1991), defendant does not establish any possibility that the trial judge confused the jurors concerning the reasonable doubt standard, and we reject his assignment of error.

[7] In defendant's final assignment of error, he contends that the North Carolina felony-murder rule offends both the state and federal constitutions because it relieves the State of proving *mens rea* at the time of the killing. This argument was recently rejected by this Court in *State v. Thomas*, 332 N.C. 544, 564, 423 S.E.2d 75, 86 (1992). We also reject it here.

For the above-stated reasons, we conclude that defendant's trial was free of prejudicial error, and a new trial is not warranted.

NO ERROR.