STATE OF NORTH CAROLINA v. FREDERICK ORLANDO COOK AND TIMOTHY DEVON SMITH

No. 262A92

(Filed 10 September 1993)

**1. Homicide § 280 (NCI4th) — felony murder — discharging firearm into occupied property — evidence sufficient**

The trial court did not err when it denied defendants' motions to dismiss charges of first-degree murder and discharging a firearm into occupied property for insufficient evidence where, viewed in the light most favorable to the State, there was ample evidence from which a jury could find that defendants Cook and Smith fired weapons into the vehicle driven by the victim; that a bullet from defendant Cook's weapon struck the victim causing his death; and that defendants were

acting in concert when they engaged the victim in conversation and fired shots at his automobile as he drove away.

**Am Jur 2d, Homicide §§ 94, 442.**

**What felonies are inherently or foreseeably dangerous to human life for purposes of felony-murder doctrine. 50 ALR3d 397.**

2. **Evidence and Witnesses § 351 (NCI4th)— murder—evidence of drug sales by defendant—admissible**

The trial court did not err in a murder prosecution by admitting evidence that defendant Cook sold cocaine on the night of the shooting. There was evidence tending to show that the victim had a drug problem and evidence about drug sales by defendant Cook and his friends on the night of the murder was relevant to show the motive for the shooting and to put the crime in context. N.C.G.S. § 8C-1, Rule 404(b).

**Am Jur 2d, Homicide § 311.**

**Admissibility, under Rule 404(b) of Federal Rules of Evidence, of evidence of other crimes, wrongs, or acts not similar to offense charged. 41 ALR Fed. 497.**

3. **Homicide § 41 (NCI4th)— murder—acting in concert—victim dead when defendant's shots fired**

The trial court did not err by denying defendant Smith's requested instruction in a prosecution for murder and for firing into occupied property where defendant Smith contended that, if the evidence supported the theory argued to the jury by the prosecutor, he could not have acted in concert in the killing of the victim because it is not criminal homicide to shoot a dead body. Given that the victim was mortally wounded during a volley of gunfire from defendants' firearms, the temporal order of the fatal shot by defendant Cook and other shots fired by defendant Smith, acting in concert with Cook, is immaterial; the underlying felony and the murder occurred in a time frame that can be perceived as a single transaction.

**Am Jur 2d, Homicide §§ 46, 71 et seq.**

Defendants appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of life imprisonment entered by Brooks, J., at the 30 June 1992 Criminal Session of Superior

Court, Cumberland County. On 22 July 1992, this Court allowed
defendant Cook's motion to by-pass the Court of Appeals as to
an additional conviction for discharging a firearm into occupied
property. Heard in the Supreme Court 11 May 1993.

*Michael F. Easley, Attorney General, by Thomas F. Moffitt,
Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Gordon
Widenhouse, Assistant Appellate Defender, for defendant
Frederick Orlando Cook.*

*Walter T. Johnson, Jr., for defendant Timothy Devon Smith.*

FRYE, Justice.

Defendants, Frederick Orlando Cook and Timothy Devon Smith,
were indicted on 27 January 1992 for first-degree murder and
discharging a firearm into occupied property. An order for joinder
was filed on 4 March 1992. Defendants were tried non-capitally
and found guilty. As to each defendant, a sentence of life imprison-
ment was imposed for the first-degree murder, and judgment on
the underlying felony was arrested.

Each defendant brings forth two issues on appeal. After a
summary of the evidence, we will address the one issue raised
by both defendants, and then we will address the additional issue
raised by each individual defendant.

The evidence at trial tended to show the following facts and
circumstances. Shortly after midnight on 28 September 1991, Of-
ficer William Saunders of the Fayetteville Police Department heard
a rapid succession of gun shots in the vicinity of the Groveview
Terrace public housing development. Within minutes, Officer
Saunders arrived at an Etna gasoline station located across the
street from the entrance to Groveview Terrace. At the gasoline
station, Officer Saunders discovered a Chevrolet El Camino which
had crashed into a utility pole. Wallace G. Thomas, Jr., [the victim]
was in the driver's seat of the El Camino with a bullet wound
to his chest.

Linwood Brisbane, a police crime scene technician, gathered
physical evidence from the crime scene including the victim's
automobile. Marks on the driver's side doorpost and rubber molding
indicated that a bullet had passed through them. There was a

bullet hole in the driver's seat belt, and a mark on the edge of the headrest indicating that it had been grazed by a bullet. A spent 10mm bullet was found in the back of the driver's seat. A second spent 10mm bullet was also found on the floorboard under the driver's seat. No weapon or spent shell casings were found in the victim's automobile. The victim's automobile was dusted for fingerprints, and defendants' fingerprints were not found on or in the vehicle.

Brisbane retraced the route the victim's vehicle had taken prior to hitting the utility pole. While retracing the route, Brisbane found several groupings of spent shell casings including a group of six spent 10mm shell casings near vehicle "scratch-off" or skid marks on the pavement.

Dr. Jerald Wolford, a forensic pathologist, performed an autopsy on the victim and concluded that the cause of death was a gunshot wound to the chest. The fatal bullet entered the victim's chest under the left arm, passed through his lung and heart, and exited from the right side of his chest. Dr. Wolford found abrasions on the knuckles of the victim's right hand, abrasions on the bridge of his nose between his eyes, and needle marks on his left arm. According to Dr. Wolford, the nonfatal wounds to the bridge of the nose were consistent with an individual being involved in a violent automobile crash, and the wounds to the hand were nonspecific.

Esther Sanford, the victim's mother, testified that her son had been a painter, carpenter, and roofer since he was sixteen years old. She also testified that on the night of the murder her son was at her house until approximately 8:30 p.m., when he borrowed his step-father's El Camino and left. Sanford testified that her son had a cocaine problem, but he had "straightened himself up."

Michael Hardison testified that on the night of the murder he saw defendants standing near a parked car driven by a white man in Groveview Terrace. Hardison testified that the street lights were on and he could see defendants' faces. Hardison also testified that no one else was near the car. Hardison heard a portion of a conversation between the driver of the car and defendants, then he saw the car rapidly pull away from the curb. Hardison heard approximately five gunshots, and saw muzzle flashes. Due to the distance between Hardison and the incident, he could not tell whether only defendant Cook, only defendant Smith, or both were shooting.

However, he did not see anyone else fire a weapon. Hardison testified that when the incident occurred he was armed with a loaded .38 caliber revolver, but he did not fire it, and later threw it in the Cape Fear River.

Hardison admitted that he had been charged with murder and shooting into an occupied vehicle in this case. He was allowed to plead guilty to assault with a deadly weapon, a misdemeanor charge with a two-year maximum sentence, in exchange for his testimony.

Genorval McKethan testified that on the night of the murder he saw defendants, Hardison, Rico McNeill and others selling drugs at Groveview Terrace. At approximately midnight, McKethan and several others were walking towards the entrance of the housing development when he heard someone yell. McKethan and the others ran towards the sound. McKethan testified that he saw defendant Smith approximately fifteen feet behind a car, and a second person in the background behind Smith. According to McKethan, both persons were shooting at the car. McKethan could not see well enough to identify the shooter behind defendant Smith.

McKethan admitted that he had also been charged with first-degree murder and shooting into an occupied vehicle in this case. As a result of a plea bargain, McKethan plead guilty to assault with a deadly weapon and received a two-year sentence.

Defendant Cook did not call any witnesses. However, defendant Smith called four witnesses in an attempt to establish an alibi defense. Doris Culbreth testified that at approximately 10:30 p.m. on the evening of the murder, she saw defendant Smith with a bicycle at the Suburban Market. According to Culbreth, she remained at the market for approximately ten minutes and when she left defendant Smith was still there. Culbreth testified that the market was about ten minutes from Groveview Terrace by car and thirty or forty minutes away by bicycle. Culbreth acknowledged that she had known defendant Smith for ten years and that he was a good friend.

Lashonda Whitlock, defendant Smith's girlfriend and the mother of three of his children, testified that on the evening of the murder, defendant Smith had been to her apartment in Groveview Terrace and left before the shooting. After the shooting, Whitlock heard over a police radio scanner that a homicide unit had been requested

to come to Grove Street and Groveview Terrace. According to Whitlock, the police broadcasted the victim's name and said that they had found a 9mm pistol. After listening to the broadcast, Whitlock left her apartment and ran towards the entrance of Groveview Terrace. Genorval McKethan was sitting on a bench and Whitlock asked him if he had seen defendant Smith. He replied, "Nah, I haven't seen Tuck [defendant Smith]."

Evette Bonner, a Groveview Terrace resident, testified that during the late night hours of 27 September and the early morning hours of 28 September 1991, she saw defendant Smith at "Charlie's" nightclub. According to Bonner, she arrived at the club at approximately 11:30 p.m., and left thirty minutes to an hour later.

Jennifer Troutman also testified that during the late night hours of 27 September or the early morning hours of 28 September 1991, she arrived at "Charlie's" nightclub at approximately 12:30 a.m. and stayed until the nightclub closed around 2:30 a.m. According to Troutman, as she was leaving the nightclub, defendant Smith asked her for a ride, she gave him a ride, and they went to a party on Mary Street with another couple. At trial, Troutman was unable to remember who the other couple was, and she could not remember at what house the party took place.

Additional facts will be discussed as they become relevant to a fuller understanding of the specific issues raised on appeal.

[1] Both defendants first assign as error the trial court's denial of their motions to dismiss. Defendants argue that the evidence was insufficient to convince a rational trier of fact of their guilt beyond a reasonable doubt.

When ruling on a motion to dismiss, the court must consider the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from the evidence. *State v. Sweatt*, 333 N.C. 407, 414, 427 S.E.2d 112, 116 (1993). The trial court must determine whether there is substantial evidence—either direct, circumstantial, or both—to support a finding that the crime charged has been committed and that defendant is the perpetrator of the crime. *Id.* "Substantial evidence" means "the evidence must be existing and real, not just seeming and imaginary." *State v. Clark*, 325 N.C. 677, 682, 386 S.E.2d 191, 194 (1989). If there is substantial evidence of each element of the

crime charged and that the defendant was the perpetrator, then a motion to dismiss should be denied. *Id.*

Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. *State v. McAvoy*, 331 N.C. 583, 589, 417 S.E.2d 489, 494 (1992). Felony murder is a murder committed in the perpetration or attempted perpetration of certain felonies including those committed or attempted with the use of a deadly weapon. N.C.G.S. § 14-17 (1986). Discharging a firearm into occupied property is a felony defined by statute as willfully or wantonly discharging or attempting to discharge a firearm into any building, structure, vehicle, aircraft, watercraft or other conveyance, device, equipment, erection, or enclosure while it is occupied. N.C.G.S. § 14-34.1 (1986). "Under the doctrine of acting in concert, if two or more persons are acting together in pursuit of a common plan or purpose, each of them, if actually or constructively present, is guilty of any crime committed by any of the others in pursuit of the common plan." *State v. Laws*, 325 N.C. 81, 97, 381 S.E.2d 609, 618 (1989), *judgment vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 550, 402 S.E.2d 573, *cert. denied*, --- U.S. ---, 116 L. Ed. 2d 174 (1991).

The evidence taken in the light most favorable to the State showed that the victim was fatally shot by a bullet that passed through his chest. Two 10mm bullets were retrieved from his car—one from the back of the driver's seat and one from under the driver's seat. The victim was a drug abuser. Drugs were being sold in Groveview Terrace on the night of the murder. Defendants Cook and Smith were seen participating in the sale of drugs in Groveview Terrace.

Michael Hardison testified that shortly before midnight he saw defendants Cook and Smith across the street from the administration building talking to a man in a parked car. At some point the car rapidly pulled away from the curb, after which Hardison heard gun shots and saw muzzle flashes. Hardison placed both defendants near the area where the spent 10mm shell casings and tire "scratch off" marks were found. Hardison was unable to tell whether one or both defendants were shooting in the direction of the car. Genorval McKethan also placed defendant Cook next to the area where the 10mm casings were found, and placed defendant Smith close to the area where a group of spent .45 caliber

shell casings were found. McKethan saw Smith approximately fifteen feet behind the car. A second person was seen in the background behind Smith and both were shooting at the car. Hardison testified that shortly after the shooting occurred, he saw defendant Cook at "Charlie's" nightclub with a 9mm or 10mm pistol sticking out of his coat pocket.

From the evidence produced at trial, the jury could reasonably infer that the victim went to Groveview Terrace to buy drugs. Defendants Cook and Smith were selling drugs when the victim arrived. The victim encountered defendants and the three of them discussed the purchasing of drugs. During the conversation something went awry, and the victim sped away. As he drove away, both defendants fired shots at his automobile. Defendant Cook was armed with a 10mm pistol, and one of the bullets fired from his gun was the fatal bullet that killed the victim. Defendant Smith was armed with a .45 caliber pistol, but none of the bullets fired from his gun hit the victim.

Viewing the evidence in the light most favorable to the State, we find that there is ample evidence from which a jury could find that defendants Cook and Smith fired weapons into the vehicle driven by the victim and that a bullet from defendant Cook's weapon struck the victim causing his death. There is also ample evidence that the defendants were acting in concert when they engaged the victim in conversation and fired shots at his automobile as he drove away. The evidence supports the finding that both defendants are guilty of the felony of discharging a firearm into occupied property and that the murder occurred in the perpetration or attempt to perpetrate that felony. Thus, the evidence supports the finding that both defendants are guilty of first-degree murder under the felony murder rule. The trial court did not err when it denied defendants' motions to dismiss for insufficiency of the evidence.

## DEFENDANT COOK'S SECOND ISSUE

[2] Defendant Cook next contends that "the trial court committed reversible error in overruling defendant's objections to testimony that he sold cocaine on the night of the shooting as this evidence was minimally probative yet highly prejudicial, thereby denying him basic constitutional rights to a fair trial and due process of law." Defendant contends that the evidence, if relevant, would be inadmissible evidence of prior bad acts under Rule 404(b). Defend-

ant Cook argues that he is entitled to a new trial because even assuming he sold drugs, Genorval McKethan's testimony bore no relevance to any material issue, and tended exclusively to show his character in an unfavorable way through wholly inadmissible evidence. We disagree.

McKethan testified that defendant Cook, defendant Smith, and others were selling drugs at Groveview Terrace on the night of the murder. Defense counsel objected on the ground that the prosecutor was leading the witness. The trial judge sustained the objection. The question was rephrased and defense counsel made a general objection. This objection was overruled. Defense counsel did not request a limiting or cautionary instruction. Testimony continued about drug sales at Groveview Terrace on the night of the murder without objection as follows:

Q. Who were some of the people you saw selling drugs down there that night?

A. Saw Frog selling drugs that day.

Q. Who else?

A. Saw Tim. I saw Hook; I saw Worm [McNeill], and a couple of older boys? [sic]

Q. And where were these drug sales taking place?

A. On the corner, like the middle of the neighborhood.

Q. Okay. When you say Hook, who are you talking about?

A. Michael Hardison.

Q. When you say Tim, who are you talking about?

A. Timothy Smith.

Q. And when you say Frog, who are you talking about?

A. Frederick Cook.

McKethan then identified defendants Cook and Smith, without objection, as the men to whom he was referring during his testimony.

Rule 404(b) of the North Carolina Rules of Evidence provides:

*Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.

It may, however, be admissible for other purposes, such as proof of motive, absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (1992). In recent cases this Court has stated that Rule 404(b) provides

> a clear general rule of *inclusion* of relevant evidence. of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.

*State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54-55 (1990). In the instant case, there was evidence tending to show that the victim had a drug problem. Evidence about drug sales by defendant Cook and his friends on the night of the murder was relevant to show the motive for the shooting and to put the crime in context. Thus, the testimony was admissible under Rule 404(b) and the trial court did not err in admitting it.

## DEFENDANT SMITH'S SECOND ISSUE

[3] In defendant Smith's second assignment of error, he contends that the trial court erred by denying his request for a jury instruction on the issue raised during the prosecutor's argument wherein the prosecutor indicated that the victim was killed during the first volley of shots. Defendant Smith argues that if the evidence supported the theory argued to the jury by the prosecutor, he could not have acted in concert in the killing of the victim because it is not criminal homicide to shoot a dead body. Defendant Smith also contends that since the argument was made to the jury, and he requested a curative instruction at the appropriate time, the trial court committed reversible error by not giving the instruction and this action was clearly prejudicial.

The portions of the prosecutor's argument at issue are as follows:

> And I submit to you, probably the first shot was Number 14 here, that was kicked back away from the other line of five, and the shooter then steps over as the car is pulling away and shoots again and again and again and again. There is a projectile that's found on the ground that you looked at, Number 8. The expert could not say, and candidly would

not say that it was a 10mm, because he didn't have the oppor-
tunity to look at it under his laboratory conditions.

. . . .

I submit to you that this projectile right here, Number
8, was fired from this 10mm gun as the car was speeding
away. And yes, indeed, it did strike something, either the
street or the bumper or the undercarriage. The bumper and
the undercarriage all of which, from your own common ex-
perience and sense you know, it's very, very hard metal, not
like a door frame, and not like the back of a truck bed behind
the seat that can be pierced. This is where the fatal bullet
was fired from right here. These marks on the pavement,
I submit to you, are the scratch marks where the car sped
away at or after the first shot that struck Mr. Thomas [the
victim] while he was like this.

The doctor said it would not be unusual for someone to
be able to live and function two or three minutes after being
struck in such manner.

. . . .

What they did not know, I submit to you, is that the
first bullet was the one that did the damage. And their attempt
to either run Mr. Wallace out of the neighborhood — or Mr.
Thomas [the victim] out of the neighborhood, whatever the
motivation, they acted together. It's almost like running with
the pack. Mr. Thomas was struck. He drove the car out. He
crashed out here. And the case starts to unwind and develop
at that point.

Defendant Smith's argument that he could not have acted in
concert in the killing of the victim because it is not criminal homicide
to shoot a dead body is fatally flawed. His conviction was not
based on his having "acted in concert in the killing of the victim,"
but rather was based on his having acted in concert in the perpetra-
tion of a felony which resulted in the death of the victim. Therefore,
whether the victim was dead or alive at the exact moment bullets
from defendant Smith's gun entered the automobile is not necessar-
ily determinative on a felony murder conviction.

This Court has held that to support convictions for a felony
offense and related felony murder, all that is required is that the

elements of the underlying offense and the murder occur in a time frame that can be perceived as a single transaction. *State v. Thomas*, 329 N.C. 423, 434, 407 S.E.2d 141, 149 (1991). In the instant case, the murder and the underlying felony of discharging a firearm into occupied property were so connected and inextricably intertwined as to form a continuous chain of events that began when the victim was alive. The evidence showed that the victim first encountered defendants near the administration building at Groveview Terrace. They engaged in a conversation, both defendants shot at the victim as he sped away in his car, and the victim lived for a few moments before he crashed his car into a utility pole. Dr. Wolford testified that the victim could have lived several minutes before dying from the gunshot wound to the ventricle of his heart. Given that the victim was mortally wounded during a volley of gunfire from defendants' firearms, the temporal order of the fatal shot by defendant Cook and other shots fired by defendant Smith, acting in concert with Cook, is immaterial. The underlying felony and the murder occurred in a time frame that can be perceived as a single transaction. Thus, the trial judge properly refused to give defendant Smith's proposed jury instruction.

NO ERROR.